UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

---

*In re*:

KARBEN4 BREWING, LLC,

Case No. 24-10358-11
Subchapter V

Debtor.

---

### MEMORANDUM DECISION

Karben4 Brewing, LLC ("Debtor") was formed as a craft brewery. It filed a voluntary Subchapter V petition in February 2024. One member, Alexander Evans ("Alex"), moved to dismiss the case under 11 U.S.C. § 1112(b). He argues lack of corporate authority or other cause for dismissal. Section 1112(b)(3) provides that the Court "shall commence the hearing on a motion [to dismiss] not later than 30 days after filing the motion, and shall decide the motion not later than 15 days after commencement of such hearing." With the parties' agreement, the Court held a final hearing on Alex's motion on May 7, 2024.

### FACTS

The Debtor was formed in 2012. It had five original members—Alex (20% membership interest); Stephen Evans ("Stephen") (30%); Ryan Koga ("Ryan") (20%); Zachary Koga ("Zak") (20%); and John Koga ("John") (10%). It is a "manager-managed" limited liability company. The initial Managers named in the Operating Agreement were Zak, Ryan, and Alex.

At its core, this dispute arises from a failed business relationship among Alex, Zak, and Ryan. The relationship among these three soured.

In 2019, Stephen gifted his membership interest to Alex. This changed the ownership to: Alex (50%); Ryan (20%); Zak (20%); and John (10%). Discussion about buying Alex out was never completed. Then in March 2020 Alex resigned as a Manager and walked away from working in the business. He was not replaced.

In 2023, Alex filed a derivative suit on behalf of the Debtor against Ryan and Zak. He says they breached their fiduciary duties to the Debtor by misappropriating transactions for their own benefit. The allegations are disputed by Ryan and Zak.

On February 23, 2024, Ryan and Zak—as Managers—adopted resolutions authorizing a bankruptcy filing. It also authorized them to oversee the Chapter 11 proceedings. There was no meeting of the Members and Alex did not vote to adopt the resolutions. The Chapter 11 was then filed.

*Alex's Motion to Dismiss*

Alex argues that Zak didn't have authority to the file the Petition on behalf of the Debtor. Alex has a 50% ownership interest in the Debtor. A decision to file a bankruptcy is a decision requiring the majority consent of the Members under the Operating Agreement, according to Alex. The Operating Agreement does not mention bankruptcy. Alex emphasizes that Managers can only make day-to-day decisions and carry out the business in the ordinary course. He argues that bankruptcy isn't an ordinary course decision and thus requires majority consent of the Members.

2

Debtor objects to Alex's motion. First, Debtor argues the Operating Agreement is unambiguous. It asserts the Operating Agreement permits Managers to make all decisions unless a decision is explicitly reserved to the Members. And Debtor says the Operating Agreement has a non-exhaustive list of actions the Managers can take in operating the business. The actions requiring majority Member consent, in contrast, is limited to an exhaustive list in the Operating Agreement according to Debtor. And since neither list mentions filing a bankruptcy petition, Debtor concludes it must be allowed under the Managers' authority.

If there is ambiguity, Debtor says that it still must be interpreted to allow the Managers to file bankruptcy under relevant canons of interpretation. Any ambiguity can also be resolved under the Wisconsin LLC statutes according to Debtor. In turn, Debtor suggests the statute offers broad authority to managers which enable them to file bankruptcy on behalf of an entity.

Alex maintains that the Managers' authority is limited to ordinary course activities. And filing a bankruptcy petition is categorically not an ordinary course activity. The silence in the Operating Agreement on the authority to file bankruptcy is a clear indication it is not an action delegated to the Managers according to Alex.

Next, Alex contends that extrinsic evidence should not be considered when ambiguity in a contract can be reconciled without it. Here, he reasons, the "ordinary course" qualifier demonstrates that the Managers were not given authority to file bankruptcy.

In its findings of fact and conclusions of law, and its brief in support, the Debtor emphasizes that the Managers routinely made major decisions without the consent of the Members. Thus, it argues, the conduct of the Members and Managers throughout the Debtor's existence demonstrates that all acts were delegated to the Managers unless expressly reserved to the Members. This should be the conclusion according to Debtor regardless of the terms of the Operating Agreement.

## DISCUSSION

Section 1112(b) of the Code provides for dismissal of a Chapter 11 for cause. Whether there was authority to file a bankruptcy can be cause. When considering whether a petition is proper, the court "must of course determine whether [it is] filed by those who have the authority to act." *Price v. Gurney*, 324 U.S. 100, 106 (1945). If a court determines those who filed the bankruptcy did not have the authority, the court "has no alternative but to dismiss the petition." *Id.*

Generally, the burden of proof to establish cause under section 1112(b) lies with the movant. *Bal Harbour Club, Inc. v. AVA Dev. Inc.*, 316 F.3d 1192, 1195 (11th Cir. 2003). But deciding whether a filing is unauthorized is a closer question. *In re ComScape Telecomms., Inc.*, 423 B.R. 816, 830 (Bankr. S.D. Ohio 2010). This is because even in the absence of section 1112(b), if there is not proper authority for the filing, the court has no choice but to dismiss the case. *In re Southern Elegant Homes, Inc.*, No. 09-02756-8-JRL, 2009 Bankr. LEXIS 1478, 2009 WL 1639745, at *1 (Bankr. E.D.N.C. June 9, 2009).

4

The filing of a petition signed by a manager and subsequent representations that the filing is authorized create an initial presumption that the filing is authorized. So the movant should bear the initial burden of establishing a prima facie case there was a lack of authority. *In re NNN 123 North Wacker, LLC*, 510 B.R. 854, 859 (Bankr. N.D. Ill. 2014). Once there is a prima facie case the filing was not authorized, the burden shifts to the debtor to establish there was proper authority. *Id.* at 861.

a. *Corporate Authority to File the Petition*

Alex's motion centers on a section of the Debtor's Operating Agreement—Section 5. The Agreement puts all decisions into the hands of the Members unless the Agreement delegates a matter to the Managers, claims Alex. He points to the provision that "[a]ny activity or event . . . which requires a vote or decision of the Members *including all day-to-day management decisions* shall be made by majority consent . . . unless this Agreement otherwise delegates that vote or decision to Managers or requires unanimous consent." ECF No. 134, Exh. 102, Section 5.1 (emphasis added).

Nowhere does the Operating Agreement require any decision or vote to be unanimous. It does, however, identify some decisions that are to be made by the Members by majority vote. ECF No. 134, Exh. 102, Section 5.6. Those matters include selling all or substantially all of the company's assets, borrowing money on a secured basis, issuing interests in the LLC, or filing an assignment for the benefit of creditors. ECF No. 134, Exh. 102, Section 5.6, ¶ (b), (e), (i), and (j).

5

The Agreement also identifies matters that are delegated to the Managers. The Managers are to "manage, direct and conduct the day-to-day business affairs of the LLC" as emphasized in the Agreement. ECF No. 134, Exh. 102, Section 5.2.

The rights and duties to be performed by the Managers are to carry out the business of the Debtor "in the ordinary course." ECF No. 134, Exh. 102, Section 5.5. Those decisions are to be by the majority of the Managers. The list of the duties is not exhaustive. But neither is it unlimited.

Managers have authority such as buying or leasing property, and selling property that isn't substantially all of the property. ECF No. 134, Exh. 102, Section 5.5, ¶ (a) and (b). The actions also include activities that are common to any business. For example, insuring property, setting up books and records, entering into contracts or agreements for routine operating matters, and hiring accountants or other professionals. In other words, the duties are activities that are customary to the "routine and day-to-day operation of a business such as that conducted by [Debtor]." ECF No. 134, Exh. 102, Section 5.5, ¶ (f).

The parties start with the view that the LLC Agreement is unambiguous. An LLC operating agreement is a contract and must be interpreted as such. *Marx v. Morris*, 2019 WI 34, ¶ 20, 386 Wis. 2d 122, 137, 925 N.W.2d 112; *Gottsacker v. Monnier*, 2005 WI 69, ¶ 22, 281 Wis. 2d 361, 374, 697 N.W.2d 436. When the terms of a contract are plain and unambiguous, it is construed as it stands. *Id.*

6

If the Court decides the Operating Agreement is ambiguous, then both sides think their view on authorization is still correct. A contract is ambiguous when its terms are "reasonably susceptible to more than one construction." *Id.* When interpreting an ambiguous contract, a court should "reject a construction that renders an unfair or unreasonable result." *Id.* at ¶ 24. "Likewise, we should adopt a construction that will render the contract a rational business instrument so far as reasonably practicable." *Id.*

The Operating Agreement is silent on the consent required to file bankruptcy. It contains no authorization for Managers to decide to file a bankruptcy.

Alex says that only day-to-day operations and decisions are delegated to the Managers. Filing a bankruptcy is not, according to Alex, a day-to-day decision or ordinary course of business. Further, the Operating Agreement does not delegate the decision to file bankruptcy to the Managers. So he says a decision to file bankruptcy is reserved to a majority vote of the Members.

Debtor, to the contrary, posits that *only* the actions contained in Section 5.6 require the majority consent of the Members. Because authorizing a bankruptcy is not listed in Section 5.6, Debtor argues it must be something that is simply within the discretion of the Managers. Debtor concludes Ryan and Zak have authority because Alex is no longer a Manager. Thus, they reason, they had the exclusive right to authorize the filing.

Section 5.5 says: "Except for those actions specified in Section 5.6 that have been reserved to the Members, the Managers are authorized to do, on the

7

LLC's behalf, all things that in a majority of their judgment, are necessary, proper or desirable to carry out the LLC business *in its ordinary course*." (emphasis added). If Section 5.6 was the only limit on the Managers' authority, then the qualifier emphasized above would be superfluous. Moreover, Section 5.5 is filled with references to ordinary course and tasks that are routine and regularly performed.

The Operating Agreement does not unambiguously authorize the filing of a bankruptcy by the Managers. The Operating Agreement delegates matters that are usual and customary to the day-to-day business of the Debtor to the Managers.

"'[O]rdinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the [debtor] in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of" a business. *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993). Determining whether a transaction occurs in the ordinary course requires the court to examine "the normality of such incurrences in [the debtor's] business operations generally." *Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.)*, 218 B.R. 390, 398 (Bankr. S.D. Ohio 1998).

Filing a bankruptcy is not an action that is in the ordinary course of business for a company. The court in *In re Avalon Hotel Partners, LLC*, 302 B.R. 377, 380 (Bankr. Or. 2003), faced a similar issue to this case. There, a Chapter 11 bankruptcy was filed by an LLC following the adoption of a resolution by the

8

LLC's manager authorizing the filing of a Chapter 11 petition without member approval. Under the *Avalon Hotel Partners'* operating agreement, "Major Decisions" required the approval of members holding more than 75% of the ownership interests. The specific list of "Major Decisions" was non-exclusive.

The court reasoned that "[a] decision to file for bankruptcy protection is a decision outside of the ordinary course of business, even for an entity in dissolution." 302 B.R. at 380. Thus, the court found that filing the petition by the debtor's manager without member approval was not authorized either by Oregon law or the operating agreement.

Many other courts have ruled similarly. It is not ordinary for a limited liability company to file a bankruptcy. *In re Crest by the Sea, LLC,* 522 B.R. 540, 545 (Bankr. D.N.J. 2014). Actions delegated to a principal shareholder "in the ordinary course" do not extend to filing a bankruptcy and so dismissal is required. *In re Zaragosa Properties, Inc.,* 156 B.R. 310, 312 (Bankr. M.D. Fla. 1993). To the point, the *Zaragosa* court concluded that "filing a Petition for Relief under Title 11 is not the ordinary course of anyone's business." *Id.* at 313. This conclusion has been reinforced by other courts when they have confirmed that filing a bankruptcy is an act that makes it impossible to carry out the "ordinary business" of a company—even if the company continues to do business. *DB Capitol Holdings, LLC v. Aspen HH Ventures, LLC (In re DB Capitol Holdings, LLC)*, No. 10-23242, 2010 Bankr. LEXIS 6567, at *12–13 (B.A.P. 10th Cir. Dec. 6, 2010).

9

Here, Debtor argues the bankruptcy filing was ordinary course. But that if the Court disagrees, then the Operating Agreement must be ambiguous. If ambiguous, Debtor says that prior actions of Debtor where Managers made decisions that were reserved to Members confirms those decisions were delegated to the Managers. Thus Debtor says the Operating Agreement must be subject to more than one construction.

That Managers are allowed to file bankruptcy is not "plain and unambiguous." The Operating Agreement is susceptible to more than one construction. *Gottsacker*, 2005 WI 69 at ¶ 22. So if the agreement is ambiguous, the Court must interpret it in a way "that will render the contract a rational business instrument so far as reasonably practicable." *Id.* at ¶ 24.

Debtor argues the Managers often undertook major acts outside the ordinary course of business without approval by the Members and thus were implicitly given authority beyond "ordinary course" activities. One example was a sublease and another was distributor agreements.

Debtor argues that it entered into a sublease and several exclusive distributor agreements without explicit Member approval. It also states that:

> In 2018, [Debtor] spent approximately $300,000 on a packaging line upgrade without obtaining member approval. In 2022, [Debtor] spend [sic] approximately $500,000 on a second packaging line upgrade without obtaining member approval. Throughout its existence, [Debtor] has purchased vehicles for Alexander Evans, Zachary Koga and Ryan Koga without approval of the members or consulting the members.

Debtor's Proposed Findings of Fact and Conclusions of Law, ECF No. 129, ¶¶ 15–22.

But the Debtor seems to conflate "ordinary course" of business with "day-to-day" business. Again, "ordinary [course] refers to the range of terms that encompasses the practices in which firms similar in some general way to the [debtor] in question engage." *Tolona Pizza Prods. Corp.*, 3 F.3d at 1033.

The Debtor manufactures and sells beer. It needs space from which to operate. The availability of credit is also needed for its operations. The manufacture of beer requires a physical location and equipment. So equipment upgrades, leases, or subleases would be ordinary course. Borrowing for the purchase of new equipment would also be a common activity.

Once manufactured, the beer must be sold. Unless it is being sold locally on the premises, there would need to be some system or arrangement for distribution. Sales of beer are accomplished using distributor agreements. Debtor does not have the requisite authority to act as a distributor. So to sell more widely it would either have had to become a licensed distributor or it would have needed to enter into agreements with a distributor.

These activities are normal industry practice for breweries. So too is periodic replacement or upgrade of equipment such as packaging lines. And it's not unusual to afford executives company vehicles; here for the three managers—Alex, Ryan, and Zak.

And Debtor ignores a simple fact. The three Managers were also Members who owned 60% of the interests in the Debtor. As a result, any decision they made was also the decision of a majority of the Members.

11

To suggest the "members never discussed" or "otherwise approved the distributor agreement[s]" is a difference without a distinction. The three were the Managers and held 60% of the interests in the Debtor. So the sublease and distribution agreements are each signed by the full Board of Managers as well as the majority of the Members. In other words, a majority of the Members approved each of the alleged "major acts" that the Debtor claims were taken without Member approval. While signatures may have included the title "Manager,"[1] these were still the acts of a majority of the Members, so they could not have occurred without discussion or agreement by the Members. So the acts were done by a majority of the Members.

The Court rejects the argument that filing a bankruptcy is ordinary course of business. It is not. Filing bankruptcy is beyond the "ordinary course" operations of the Debtor.

The Court must interpret the plain language of a contract "consistent with what a reasonable person would understand the words to mean under the circumstances." *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶22, 326 Wis. 2d 300, 311, 786 N.W.2d 15. Under the circumstances of this case, a reasonable person would understand the scope of the Managers' authority to be limited to "ordinary course" activities, which doesn't include filing a bankruptcy petition.

---

[1] At least one agreement actually bears the title "Managing Member" behind each name. *See, e.g.*, ECF No. 134, Exh. 108, p. 6.

12

Beyond the "ordinary course" qualifier at the beginning of Section 5.5, the listed descriptions of Managers' authority are filled with the qualifiers ordinary course, routine, and day-to-day. Based on that language, the parties intended to limit the Managers' authority to ordinary course, routine, and day-to-day tasks. These activities are part of a routine or regularized practice and part of the normal or regular routine in managing a trade or business. *See Black's Law Dictionary* (11th ed. 2019). Filing a bankruptcy petition is not routine, day-to-day, or ordinary course. It is neither a normal nor common business practice to file a bankruptcy.

Even if Section 5.6 (Action Reserved to Members) is exhaustive, Managers would still need to be granted authority to file the petition on behalf of the Debtor. This is because Section 5.1 (Voting and Decision by Members) reserves authority to the Members <u>unless</u> authority is delegated to the Managers.[2]

Debtor posits that the Managers' authority to file bankruptcy is subsumed in the phrase "including but not limited to." This reasoning conflicts with the overwhelming weight of case law interpreting the filing of a bankruptcy petition to fall outside of "ordinary course" activity. And it's not what a reasonable person would understand the scope of Managers' authority to

---

[2] "Any activity or event of the LLC which requires a vote or decision of the Members including all day-to-day management decisions shall be made by majority consent of the Members *unless this Agreement otherwise delegates that vote or decision to Managers* or requires unanimous consent." Operating Agreement, ECF No. 134, Exh. 102, Section 5.1 (emphasis added).

include given the number of instances that limit the authority to "ordinary course" activities.

Finally, Debtor's argument that "assignment for the benefit of creditors" and "bankruptcy" do not equate is unavailing. In essence, Debtor is arguing that "*expressio unius est exclusio alterius,*" expression of one thing means exclusion of another. Although this canon typically applies in statutory construction, courts have often used it in contract interpretation. *See, e.g., Smith v. Stonebridge Life Ins. Co.,* 217 Fed. App'x 360 (5th Cir. 2007); *Petro Star, Inc. v. BP Oil Supply Co.,* 584 Fed. App'x 709 (9th Cir. 2014). The Supreme Court has cautioned that the so-called expression-exclusion canon "is only a guide, whose fallibility can be shown by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion of its common relatives." *United States v. Vonn,* 535 U.S. 55, 65 (2002).

Such "contrary indications" are present here. Managers' authority is limited to ordinary course activity, and Members' consent is required to make an assignment for the benefit of creditors. Generally, a receivership may be less expensive than bankruptcy and faster. Why, then, would Member consent be required to place the Debtor in a cheaper and quicker alternative to bankruptcy that afforded no opportunity to reorganize the affairs of the business, but *not* required for bankruptcy? Logic refuses to endorse such an interpretation.

If the authority of Managers to file a bankruptcy is not in the Operating Agreement, Debtor has a last theory to support the claimed authority. The fallback of Debtor is that if it is not authorized by the Operating Agreement

14

then it must be authorized by Wisconsin Statutes. A limited liability company

can be either member or manager managed. Wis. Stat. §§ 183.0212(1)(d) and

183.0407. Except as expressly provided under the statutes or an operating

agreement, the management and conduct of the company is vested in the

members. *Id.* at § 183.0407(2)(a). Neither the statutes nor the Operating

Agreement expressly vest the authority to file a bankruptcy in the Managers.

Filing a petition is not an action taken in the ordinary course. This

Debtor has never filed a bankruptcy. A bankruptcy is not a routine or

customary activity of any business. And interpreting the plain language of the

Operating Agreement consistent with what a reasonable person would

understand the words to mean under the circumstances, it doesn't give the

Managers the authority to file bankruptcy without consent of the Members.

While dismissal may or may not be in the best interests of creditors, the

necessary predicate to authorize a bankruptcy is absent—proper corporate

authority.

### CONCLUSION

For these reasons, the Court grants the motion of Alexander Evans to

dismiss.

This decision shall constitute findings of fact and conclusions of law

pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil

Procedure.

A separate order consistent with this decision will be entered. Pursuant to the request of the Movant, the order dismissing the case will not be effective for 14 days from the date of the order so that the parties may pursue discussions related to whether an accord, agreement, or settlement might be achieved.

Dated:  May 21, 2024

BY THE COURT:

Hon. Catherine J. Furay
U.S. Bankruptcy Judge

16